IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–00825–EWN–MEH


SUSAN LEDERMAN,

      Plaintiff,

v.

ANALEX CORPORATION, and
RELIANCE STANDARD LIFE INSURANCE COMPANY,

      Defendants.

_____

## ORDER AND MEMORANDUM OF DECISION
_____

      This is an Employee Retirement Income Security Act ("ERISA") case.  Plaintiff Susan

Lederman alleges that Defendant Reliance Standard Life Insurance Company improperly denied

her short-term disability benefits in violation of the ERISA statute, 29 U.S.C. § 1001 *et seq.*

(2006).[1]  This matter is before the court on "Plaintiff's Motion for Judgment Based on the

Administrative Record and Brief," filed January 9, 2007.  Jurisdiction is premised upon 29 U.S.C.

§ 1132 (2006) and 28 U.S.C. § 1331 (2006).

---

[1]This court granted Plaintiff's motion to dismiss Analex Corporation as a defendant on
July 3, 2006.  (Order of Dismissal of Analex Corp. [filed July 3, 2006].)

**FACTS**

*1.     Factual Background*

Plaintiff worked as an administrative assistant at Analex Corporation ("Analex") in Colorado until May 30, 2005.  (Compl. ¶¶ 13, 16 [filed Apr. 29, 2006] [hereinafter "Compl."]; *admitted in relevant part at* Answer with Affirmative Defenses from Reliance Standard Life Ins. Co. ¶¶ 13, 16 [filed May 23, 2006] [hereinafter "Answer"].)  Plaintiff alleges she was unable to continue working due to fibromyalgia and other medical problems.[2]  (*Id.* ¶ 16; *denied at* Answer ¶ 16.)  Analex terminated Plaintiff's employment by letter effective June 10, 2005.  (*Id.* ¶ 17; *admitted in relevant part at* Answer ¶ 17.)

During Plaintiff's tenure with Analex, the company sponsored and administered a disability plan (hereinafter the "Plan") as a benefit to its Colorado employees.  (*Id.* ¶ 5; *admitted at* Answer ¶ 5.)  The Plan was underwritten by Defendant.  (*Id.* ¶ 6; *admitted at* Answer ¶ 6.)  While employed at Analex, Plaintiff submitted an application for Plan benefits in compliance with the Plan's written instructions.  (*Id.* ¶ 16; *admitted in relevant part at* Answer ¶ 16.)

This case centers around Defendant's decision to deny Plaintiff short-term disability benefits (hereinafter "STDB") beyond June 19, 2005.  (Admin. R. at 43–44 [filed Feb. 7, 2007] [hereinafter "Admin. R."].)  Plaintiff's STDB, had they not been terminated, would have been

---

[2]Fibromyalgia is "[o]ne of a group of nonarticular (not affecting joints) rheumatic diseases . . . characterized by dull and persistent pain, tenderness, and stiffness of (1) muscles, (2) regions where tendons are inserted into bones, and (3) nearby soft tissues."  J.E. SCHMIDT, M.D., 2–F ATTORNEYS' DICTIONARY OF MEDICINE 1790 (Matthew Bender & Co. 2005).

exhausted on June 29, 2005, at which point Plaintiff would have been eligible for long-term

disability benefits. (*Id.* at 47.)  Thus, the narrow issue before the court is whether Plaintiff was

disabled between June 19, 2005 and June 29, 2005.  Understanding this dispute necessitates a

survey of the medical evidence contained in the administrative record and supplemental proffer, as

well as a review of Defendant's decisionmaking process in choosing to deny the benefits at issue.

     *a.*     ***Medical Evidence Contained in the Administrative Record***

     Plaintiff reported that she began experiencing symptoms of fibromyalgia starting in

approximately 1996. (*Id.* at 198.)  On March 23, 2005, David Conway, M.D., one of Plaintiff's

treating physicians, completed a patient evaluation form provided by Defendant.  (*Id.* at 201.)  He

diagnosed Plaintiff with fibromyalgia, indicated her subjective symptoms were "body pain" and

"fatigue," and noted her treatment included the following antidepressant medications: Elavil,

Trazodone, and Zoloft.  (*Id.*)  Dr. Conway wrote that Plaintiff was unable to work beginning on

March 24, 2005, but was expected to return to work on a full-time basis on April 24, 2005.  (*Id.*)

According to the doctor, Plaintiff's physical limitations were sixty to seventy percent, rendering

her "incapable of clerical or administrative (sedentary) activity." (*Id.*)  Her psychiatric impairment

was "marked," meaning she was "unable to engage in stress situations or engage in interpersonal

relations." (*Id.*)

     On April 13, 2005, Plaintiff saw Eric Westerman, D.O. for a rheumatologic consultation.

(*Id.* at 198–99.)  Plaintiff reported to Dr. Westerman that her fibromyalgia had been associated

with fatigue, poor sleep, chronic pain, and cognitive dysfunction, and that her discomfort had

increased over time.  (*Id.* at 198.)  Physical exam revealed "<u>classic</u> fibromyalgia trigger points,"

with "[n]o synovitis or tenderness noted otherwise."[3] (*Id.* at 199 [emphasis in original].)  Dr.

Westerman's impression was that Plaintiff "has a classic presentation [of fibromyalgia] with poor

sleep and probably superimposed sleep apnea." (*Id.*)  Because Plaintiff was sleeping better on

Trazodone and she was snoring less due to weight loss, he deferred further sleep study. (*Id.*)  The

doctor administered "a few" trigger point injections and increased Plaintiff's Trazodone

prescription. (*Id.*)

On April 19, 2005, Dr. Westerman opined that Plaintiff should be on short term disability

for one month. (*Id.* at 197.)  On May 10, 2005, the doctor noted Plaintiff's fibromyalgia was

"still fairly significant." (*Id.* at 192.)  He wrote that Plaintiff had stopped using a continuous

positive airway pressure (CPAP) device to help her sleep because it was "uncomfortable," and

prescribed Cymbalta, an anti-depressant, for her pain. (*Id.*)  The doctor's impression was that

Plaintiff's fibromyalgia was "basically stable." (*Id.*)

On May 17, 2005 and June 7, 2005, Dr. Westerman administered trigger point injections

to Plaintiff. (*Id.* at 172, 173.)  During the latter appointment, clinical notes show that Cymbalta

"helped" Plaintiff's pain, but may have been causing facial twitching. (*Id.* at 172.)  Further,

Plaintiff complained of continuing cognitive problems and headaches. (*Id.*)  Plaintiff's physical

exam was "consistent with fibromyalgia and trochanteric bursitis." (*Id.*)  Dr. Westerman

recommended that Plaintiff "start using her oxygen," opining that her failure to do so was "really

contributing to her ongoing pain, cognitive dysfunction, and fatigue." (*Id.*)

---

[3]Synovitis is inflamation of the membrane lining the interior of a joint accompanied by
accumulation of fluid.  5–S ATTORNEYS' DICTIONARY OF MEDICINE 2664.

On June 20, 2005,  M. Lubrecht, R.N. — who appears to be solely affiliated with

Defendant — reviewed Plaintiff's medical records through May 14, 2005.  (*Id.* at 189.)  The

nurse concluded:

> Claimant with fibro[myalgia] per doc[tor] stable on [?] medication.  Records do
> not support R & L's [?] used beyond 5/10/05.  While claimant with complaints of
> pain[,] this would not be expected to preclude sed[entary] function[.  T]here's
> nothing to suggest or support medication related impairment.

(*Id.*)

On July 13, 2005, Plaintiff returned to Dr. Westerman and reported that: (1) Cymbalta

was not helping her pain; (2) she was having sleeping problems; and (3) she continued to hurt "all

over" to the point that should could not work.  (*Id.* at 171.)  The doctor changed Plaintiff's

prescription from Cymbalta to Effexor, another anti-depressant.  (*Id.*)

On July 14, 2005, Stuart Kassan, M.D., whom Plaintiff had visited for a second opinion,

noted that Plaintiff was experiencing "[i]ncreased depression."  (*Id.* at 187.)  Plaintiff complained

of persistent pain over her cervical, thoracic, and lumbrosacral spine.  (*Id.*)  Physical exam

revealed multiple tender points over her cervical, thoracic, and lumborsacral spine, as well her

hips, knees, ankles, and elbows.  (*Id.* at 188.)  Dr. Kassan opined: "[I]t seems the patient

definitively has a fibromyalgia syndrome with multiple tender points and fatigue with a history of

asthma, hypertension, and migraine headaches.  I feel at this point the patient certainly is totally

disabled on the basis of her underlying condition."  (*Id.*)

On August 30, 2005, Plaintiff told Dr. Westerman that she was "doing horribly."  (*Id.* at

169.)  She had just weaned off her migraine medication because it made her neurotic, and had

since experienced increased pain.  (*Id.*)  Plaintiff complained of "pain all over," numbness in her left arm, and frustration that medications were ineffective in controlling her pain.  (*Id.*)  Physical exam revealed a major flare of fibromyalgia, as well as significant upper airway resistance.  (*Id.* at 170.)

In a September 2005 appointment with Dr. Westerman, Plaintiff reported that she could not sleep, but that Provigil, her new medication intended to treat her sleep apnea, had improved her alertness and brain function.  (*Id.* at 167.)  After a physical exam, the doctor assessed Plaintiff with: (1) slightly improved fibromyalgia; (2) worsened insomnia; and (3) acute myofascial pain requiring a stronger muscle relaxant.  (*Id.* at 168.)  On September 26, 2005, Dr. Westerman noted that "[Plaintff was] not doing well at all as it relates to her fibromyalgia.  She continue[d] to have quite a bit" of pain, though her sleep was better on Lunesta, a sleep aid.  (*Id.* at 166.)  He further noted that Zanaflex, a muscle relaxant, was causing Plaintiff "quite a sleep hangover."  (*Id.*)  Plaintiff reported that her Cymbalta was helping her "to some degree," and that she was using oxygen for her sleep apnea.  (*Id.*)  Dr. Westerman opined that Plaintiff was on too many medications.  (*Id.*)  He took her off Zanaflex, Provigil and Lunesta, kept her off Trazodone, and prescribed Ambien, another sleep aid, as well as continued use of oxygen.  (*Id.*)

Defendant scheduled a functional capacity evaluation ("FCE") for Plaintiff with Julie Balk, MPT for December 6 and 7, 2005.  (*Id.* at 146–54.)  The evaluation revealed Plaintiff gave full effort on her tests and had consistent performance on twenty-six of twenty-seven tests repeated on the first and second day of the evaluation.  (*Id.* at 148.)  Based on the evaluation, Ms. Balk concluded Plaintiff was capable of medium work "for all lifts with the exception of [f]requent lift-

carry and floor to center lifts in which she was placed in the [heavy] classification category." (*Id.* at 147.)  On January 23, 2006, Nurse Lubrecht reviewed the FCE report and concluded: "While [the] report is limited it does document claimant with full time light restrictions and limitations[;] while she meets some of the criteria for medium restrictions and limitations[,] she does not meet them all." (*Id.* at 146.)

      *b.*      ***Supplemental Medical Evidence***

      Plaintiff has submitted supplemental medical evidence that she argues should have been considered by Defendant and included in the administrative record.  (Mot. for J. Based on the Admin. R. and Br. at 9–10 [filed Jan. 9, 2007] [hereinafter "Pl.'s Br."]; *id.*, Ex. 1 [Supplement].) Defendant, of course, disputes this point.  (Resp. to Mot. for J. Based on the Admin. R. from Def. Reliance Standard Life Ins. Co. at 6–9 [filed Feb. 7, 2007] [hereinafter "Def.'s Resp."].)  As will be seen below, the substance of the supplemental evidence is relevant to its admissibility; thus, I review the evidence here.  Plaintiff's affidavit, dated January 30, 2006, stated in relevant part:

> The [FCE] was extremely onerous, causing me extreme levels of pain.  I tried my very best to follow the instructions of the [FCE] personnel.
>
> I was incapacitated for almost two full weeks after the [FCE] . . . .  By "incapacitated," I mean that I was unable to perform rudimentary and basic tasks that I need to do to survive, including personal grooming, driving, shopping for groceries, cooking, and other ordinary activities.
>
> My muscles were extremely sore after the [FCE] was performed and I was unable to lift any substantial weight, bend over, attend to written correspondence, and exercise.  I was physically exhausted during this time, wanting to rest and sleep, but being unable to get comfortable and achieve restful sleep.

(Pl.'s Br., Ex. 1 at 6 [Supplement].)

On February 22, 2006, Plaintiff sent Defendant a letter penned by Dr. Westerman on

February 14, 2006, stating:

> I have reviewed the [FCE] done on [Plaintiff] recently where they noted that she
> could go back to work even in a light-medium duty employment.  She relates that
> she gave a <u>full</u> effort for two days, as the FCE noted (no signs of malingering).
> She notes that for two weeks she had significant increase in pain, which is typical
> for patients with fibromyalgia who exert full effort during a formal FCE.  This is
> consistent with her report of pain after exertion and in fact has significant pain with
> minimal exertion on most days.  She does relate that her discomfort has improved
> to about a [three out of ten] in severity — down from approximately an [eight],
> <u>but</u> unfortunately she has severe cognitive dysfunction on the Lyrica, which has
> presumably been helping her discomfort.  As such, she does remain unable to
> work, but she would rather trade significant cognitive dysfunction for decreased
> pain.
>
> At this point in time, I would recommend that she continue on disability, although
> if more formal documentation is required, she may need neuropsychiatric testing.
> Regardless, in my mind from a clinical perspective, she remains disabled.

(*Id.*, Ex. 1 at 8–9 [Supplement] [emphasis in original].)

### c.     *Defendant's Decision to Deny Benefits*

Upon an employee becoming disabled, the Plan provides up to thirteen weeks of STDB.[4]

(Admin. R. at 6.)  On or around March 25, 2005, Plaintiff made an initial claim for disability

benefits to Reliance Standard based on her fibromyalgia diagnosis.  (*Id.* at 135.)  Defendant

approved Plaintiff's claim and provided benefits through June 19, 2005.  (*Id.* at 43.)  By letter

_____

[4]The Plan defines disabled as:
(1) unable to do the material duties of his/her job; and
(2) not doing any work for payment; and
(3) under the regular care of a physician.

(Admin. R. at 8, 43.)

-8-

dated June 23, 2005, Defendant refused to provide benefits past June 19, 2005 because Plaintiff's medical records did not support a finding that she was precluded from returning to her job as an administrative assistant.  (*Id.* at 43–44.)  Defendant supported its decision by reviewing Dr. Westerberg's clinical notes from May of 2005, which Defendant contended showed Plaintiff's condition was "stable with medication therapy," and did not "support or suggest a medication related impairment."  (*Id.*)

On August 17, 2005, Plaintiff appealed this decision, attaching Dr. Kassan's July 14, 2005 report regarding Plaintiff.  (*Id.* at 41.)  On October 13, 2005, Defendant wrote Plaintiff requesting she return a medical records release form it sent to her one month prior.  (*Id.* at 38.)  In reviewing Plaintiff's appeal, Defendant sought additional medical records from Drs. Westerman and Kassan.  (*Id.* at 33–34, 37.)  On November 2, 2005, Defendant wrote Plaintiff an update regarding its review of her appeal.  (*Id.* at 31.)  Defendant acknowledged that it was required to make a decision within forty-five days of the date her appeal was received, but stated that it was permitted to take an additional forty-five days if necessary.  (*Id.*)  Because Defendant was still reviewing Dr. Kassan's and Dr. Westerman's records, it requested this additional time.  (*Id.*)  On November 15, 2005, Defendant informed Plaintiff that it was still in the process of reviewing her appeal and had made arrangement for her to undergo an FCE.  (*Id.* at 28.)  On December 14, 2005, Defendant informed Plaintiff that it expected the FCE report to be completed within a few weeks and it would "be in touch with [Plaintiff] again immediately after [it] receive[d] this."  (*Id.* at 25.)

On January 24, 2006, Defendant upheld its original decision to deny further STDB,

finding that "the medical evidence does not support disability as defined in the [Plan]." (*Id.* at

22–24.) Defendant based its decision on: (1) Dr. Westerman's statement that Plaintiff's

fibromyalgia was "basically stable;" (2) Nurse Lubrecht's conclusion that Plaintiff's complaints of

pain would not preclude sedentary work and there was no indication of any complications from

Plaintiff's medications; (3) Plaintiff's failure to utilize her CPAP device; (4) Dr. Westerman's

failure to note on May 17, 2005 that Plaintiff had a work impairment; and (5) the FCE report

showing that Plaintiff had the capacity for light-level work. (*Id.* at 23.)

On February 1, 2006, Plaintiff submitted a letter to Defendant requesting it consider

Plaintiff's affidavit discussing her pain during and after the FCE. (Pl.'s Br., Ex. 1 at 5–6

[Supplement].) On February 7, 2006, Defendant refused to consider Plaintiff's affidavit,

explaining that its internal guidelines only allow for one appeal, which had already been provided.

(Admin. R. at 21.) On February 22, 2006, Plaintiff sent Defendant Dr. Westerman's February 14,

2006 letter regarding his views of Plaintiff's FCE. (Pl.'s Br., Ex. 1 at 8 [Supplement].) On an

unknown date, Defendant returned this letter to Plaintiff and enclosed a copy of its February 7,

2007 letter to Plaintiff by way of explanation. (Admin. R. at 20; *see* Pl.'s Br., Ex. 1 at 10–11

[Supplement].) On March 3, 2006, Plaintiff re-sent Dr. Westerman's letter, citing *Gilbertson v.*

*Allied Signal*, 328 F.3d 625 (10th Cir. 2003), a Tenth Circuit case that Plaintiff purported

discourages "sandbagging" and encourages a continuing dialogue between insurer and insured

concerning the question of an insured's disability. (Admin. R. at 20.) On March 22, 2006,

Defendant informed Plaintiff that: (1) *Gilbertson* was inapposite; (2) Plaintiff was entitled to only

one appeal; (3) she received that appeal; and (4) the decision denying her further STDB was final. (*Id.* at 19.)

**2.     *Procedural History***

On April 29, 2006, Plaintiff filed a complaint in this court alleging Defendant failed to comply with its fiduciary, contractual, regulatory, and/or statutory obligations under federal law. (Compl.)  On March 23, 2006, Defendant filed an answer.  (Answer.)  On January 9, 2006, Plaintiff filed the instant motion for judgment based on the administrative record or brief, alleging: (1) Defendant's denial of benefits was not supported by substantial evidence; and (2) Defendant deliberately "sandbagged" Plaintiff with the FCE report.  (Pl.'s Br.)  On February 7, 2007, Defendant responded to the motion.  (Def.'s Resp.)  On February 27, 2007, Plaintiff replied in support of her motion.  (Reply in Supp. of Mot. for J. Based on Admin. R. [filed Feb. 27, 2007] [hereinafter "Def.'s Reply"].)  This matter is fully briefed.

## ANALYSIS

**1.     *Standard of Review***

Courts apply a *de novo* standard of review regarding a plan administrator's denial of benefits unless the benefit plan gives the administrator discretionary authority to determine an employee's eligibility for benefits or to construe the terms of the plan.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Fought v. UNUM Life Ins. Co. of Am.*, 357 F.3d 1173, 1002–03 (10th Cir. 2004).  Here, both parties agree the Plan gives Defendant discretionary authority to determine an employee's eligibility for benefits.  (Pl.'s Br. at 9; Def.'s Resp. at 5; Admin. R. at 12.)  Where the plan grants the plan administrator discretionary authority, courts

review the administrator's decision under an arbitrary and capricious standard. *Fought*, 379 F.3d at 1003. This review is generally limited to the administrative record. *Id.*; *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 823–24 (10th Cir. 1996).

The burden under the arbitrary and capricious standard depends upon whether the plan administrator operates under a conflict of interest. In denial of benefits cases, the plaintiff is required to prove the existence of a conflict of interest. *Fought*, 379 F.3d at 1005. The parties agree that Defendant has an inherent conflict of interest as both the plan insurer and benefits decisionmaker. (Pl.'s Br. at 9; Def.'s Resp. at 5.) "Where the plan administrator operates under a conflict of interest, . . . the court may weigh that conflict as a factor in determining whether the plan administrator's actions were arbitrary and capricious." *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998). Further:

> the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard. In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence.

*Fought*, 379 F.3d at 1006 (citation omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]. Substantial evidence requires more than a scintilla but less than a preponderance." *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (internal quotation marks omitted) (alteration in original).

*2.*     ***Evaluation of Claims***

Plaintiff contends Defendant's denial of STDB was arbitrary and capricious because: (1) it was not supported by substantial evidence; and (2) Defendant deliberately "sandbagged" Plaintiff by denying her the opportunity to respond to the only significant record evidence supporting a finding of non-disability.  (Pl.'s Br. at 9–11.)  Defendant counters that: (1) Plaintiff's supplemental evidence is not properly before the court because it was not available to Defendant prior to making a decision on Plaintiff's appeal; and (2) Plaintiff provided no objective proof that she was disabled.  (Def.'s Resp. at 6–11.)  I need only address the plan administrator's treatment of Plaintiff's supplemental evidence.

In the context of an arbitrary and capricious review, the Tenth Circuit has determined that the district court "generally may consider only the arguments and evidence before the administrator at the time it made the decision." *Chambers*, 100 F.3d at 823.  Plaintiff urges that under *Hall v. Unum Life. Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002), the court should allow supplementation of the record under the exceptional circumstance "in which there is additional evidence that the claimant could not have presented in the administrative record.'"  300 F.3d at 1203 (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017 [4th Cir. 1993]).  However, *Hall* involved a *de novo* review.  *Id.* at 1202.  The Tenth Circuit, relying on *Sandoval*, has rejected the contention that the "exceptional circumstances" that may warrant supplementation of the record in a *de novo* review are also applicable in the context of an arbitrary and capricious review.  *Chambers*, 100 F.3d at 824 (citing 967 F.2d 377).

Plaintiff urges *Sandoval* is distinguishable from the instant case.  I agree.  In *Sandoval*, the court found that because the plaintiff failed to bring the evidence of his psychological impairment to the attention of the plan administrator prior to the completion of his review of claimant's request for benefits, the plaintiff could not complain of the administrator's failure to consider the evidence, and had no right to a remand.  967 F.2d at 381.  "In effect," the court explained, "a curtain falls when the fiduciary completes its review, and for the purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision."  *Id.*  As both Plaintiff and Defendant point out, however, the claimant in *Sandoval* knew of the medical diagnosis that suggested he was not disabled *prior* to the plan administrator's decision, and  was "invited . . . to submit additional evidence," but declined to do so.  *Id.* at 382.  Plaintiff argues that she, unlike the claimant in *Sandoval*, did not have knowledge of the results of the FCE nor an opportunity to respond to those results.  (Pl.'s Reply at 3–4.)  Defendant counters that Plaintiff knew the FCE was being conducted during the appeal and at no time asked for a copy of the report or requested an opportunity to respond to it while her claim was pending.  (Def.'s Resp. at 7)

I find that Plaintiff was not given an opportunity to respond to the FCE report through no fault of her own.  Although Plaintiff did not explicitly request a copy of the report, she had no reason to do so, because Defendant — on its own initiative — informed Plaintiff that it would notify her upon receipt of the FCE report.  (Admin. R. at 25.)  More specifically, in a December 14, 2005 letter to Plaintiff, Defendant explained that a decision on her claim had been placed on hold pending its receipt of the FCE report, which was expected within a few weeks.  (*Id.*)

-14-

Additionally, Defendant stated it "[would] be in touch with [Plaintiff] again *immediately* after [it] receive[d] this [report]." (*Id.* [emphasis added].)  Under these circumstances, Plaintiff had every reason to believe that she would be informed of the results of the FCE report *prior* to Defendant's final decision on her claim.

  As the *Sandoval* court pointed out, ERISA requires a "full and fair review by the appropriate named fiduciary of the decision denying the claim."  967 F.2d at 381–82 (citing 29 U.S.C. § 1133[2]).  "[R]eceiving a 'full and fair review' requires 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'"  *Id.* at 382 (quoting *Sage v. Automation, Inc. Pension Plan & Trust*, 845, 893–94 [10th Cir. 1998] [further internal quotation marks omitted]).  In the instant case, it cannot be contested that Defendant's action denied Plaintiff the "opportunity to address the accuracy and reliability of the evidence."  *Id.*  I hold that by failing to inform Plaintiff of the FCE report, which Defendant relied upon in denying STDB, and consequently barring Plaintiff from responding to the report, Defendant improperly denied Plaintiff a full and fair review of her claim.

  This court recognizes that it would be unreasonable to require insurers to share with a claimant all of the evidence they gather regarding that claimant's alleged disability and to allow the claimant time to respond.  As Defendant points out, such a requirement could "'lead to an interminable back-and-forth between the plan administrator and the claimant.'"  (Def.'s Resp. [quoting *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 731 n.2 (9th Cir.

2006)].)  Requiring the opportunity for rebuttal under the facts of this particular case, in my

opinion, does not pose such a threat.  First, Plaintiff's rebuttal was speedy and narrow.  Defendant

denied benefits on January 24, 2006.  (Admin. R. at 22–24.)  On February 1, 2006, Plaintiff

submitted her short affidavit explaining the physical ramifications of her FCE.  (Pl.'s Br., Ex. 1 at

5–6 [Supplement].)  On February 22, 2006, Plaintiff submitted Dr. Westerman's letter regarding

his views of the FCE.  (*Id.*, Ex. 1 at 9 [Supplement].)  Admission of this timely, narrow rebuttal

evidence cannot be said to open the door to an interminable back-and-forth.

      Second, I want to be clear that Defendant is not required to permit a response to *all*

evidence, just to evidence essential to its benefits determination, such as the evidence at issue in

the case at bar.  Defendant, apparently because it did not feel it could make a decision based on

the medical records supplied by Plaintiff, postponed its decision in order to have Plaintiff undergo

an FCE.  (Admin. R. at 28.)  Defendant then placed Plaintiff's appeal decision on hold while

awaiting the results of the FCE.  (*Id.* at 25.)  Finally, in Defendant's decision letter, it devoted two

paragraphs to the new evidence it considered on appeal, which included medical records from

both Dr. Westerman and Dr. Kassan, as well as the FCE report.  (*Id.* at 23.)  Only two sentences

of these two paragraphs were dedicated to the doctors' medical records, and I have reproduced

them here: "You filed an appeal on [Plaintiff's] behalf, providing a narrative report for a Dr.

Stuart Kassan.  Copies of medical records were obtained from Dr. Kassan and Dr. Westerman."

(*Id.*)  Defendant did not detail any of the substance of these records.  (*See id.*)  Instead, the

remainder of the two paragraphs detailed the FCE report and the conclusions drawn by Nurse

Lubrecht based on this report.  (*Id.*)  Under these circumstances, I can only conclude that the FCE

report was central to Defendant's decision to deny Plaintiff further STDB.  By denying Plaintiff

the opportunity to responde to a medical finding at the heart of Defendant's decision, Defendant

prevented Plaintiff from receiving a "full and fair review" of her claim, rendering any decision

based upon the incomplete record arbitrary and capricious.  *Cf. Skinner v. Admin. Comm. of W.R.*

*Grace & Co.*, No. 91–6224, 1992 U.S. App. LEXIS 1478, at *10 (10th Cir. Feb. 6, 1992)

(finding that a plan administrator's failure to apprise plaintiff of a doctor's opinion that she was

not disabled did not render the denial of benefits arbitrary and capricious *because*: [1] she did not

allege that she could have rebutted the evidence; and [2] she alleged no prejudice from the plan

administrator's failure to apprise her of the opinion); *see also Lemon v. E.A. Miller, Inc.*, No.

1:04CV107DAK, 2005 U.S. Dist. LEXIS 32539, at *20 (D. Utah Apr. 18, 2005) (finding that

because, *inter alia*, the plaintiffs "were unable to present this evidence during the administrative

process because they were not given notice of what evidence was relied upon to make the

decision" that "it would be equitable and appropriate to consider [the plaintiffs'] additional

evidence").

## 4.     *Conclusions*

        Rather than substituting my view of the facts for that of the fiduciary below, I reverse and

remand the plan administrator's decision with instructions for Defendant to reopen Plaintiff's

appeal for the limited purpose of considering her already-proffered rebuttal evidence.  *See Weaver*

*v. Phoenix Home Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993) ("Normally, where the plan

administrator has failed to comply with ERISA's procedural guidelines and the

plaintiff/participant has preserved his objection to the plan administrator's noncompliance, the

proper course of action for the court is to remand to the plan administrator for a 'full and fair'

review."); *see also Caldwell v. Life Ins. Co. of N. Am.*, 959 F. Supp. 1361, 1369 (D. Kan. 1997)

(finding a claim unripe for judicial review because the plan administrator failed to provide plaintiff

a full and fair administrative review).

Based on the foregoing it is therefore:

ORDERED that the plan administrator's decision is REVERSED and REMANDED for

proceedings consistent with this opinion.

Dated this 12th day of September, 2007.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge